UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

SAMMANTHA M. GROVER,

    Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.

Case No. 1:11-cv-1208

Honorable Joseph G. Scoville

**OPINION**

This is a social security action brought under 42 U.S.C. § 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claims for supplemental security income (SSI) benefits. On April 24, 2007, plaintiff, then 19-years-old, filed an application for SSI benefits alleging disability on the basis of asthma.[1] Her claim was denied on initial review. (A.R. 64-67). On September 28, 2009, plaintiff received a hearing before an administrative law judge (ALJ), at which she was represented by counsel. (A.R. 30-62). On October 27, 2009, the ALJ issued a decision finding that plaintiff was not disabled. (A.R. 19-26). On September 14, 2011, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

---

[1] SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004). The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed. Thus, May 2007 is plaintiff's earliest possible entitlement to SSI benefits.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties voluntarily consented to have a United States magistrate judge conduct all further proceedings in this case, including entry of final judgment. (docket # 10). Plaintiff argues that the Commissioner's decision should be overturned on the following grounds:

> A. The ALJ's Decision was not based on substantial evidence because he failed to give proper weight to the findings and opinion of Plaintiff's physician as required by 20 C.F.R. § 416.929(d) and applicable case law.
>
>> 1. As a treating specialist, Dr. Abraham's opinion was entitled to controlling weight.
>>
>> 2. The ALJ's failure to specifically state how much weight he actually gave Dr. Abraham's opinion is reversible error.
>
> B. The ALJ's residual functional capacity (RFC) finding is not supported by substantial evidence as required by 20 C.F.R. § 416.914 and applicable case law.
>
>> 1. The ALJ's Decision is not based on substantial evidence because there is no medical evidence of record supporting it where there was no DDS physician review, the ALJ rejected the treating physician's testimony, and the ALJ did not find the Plaintiff fully credible.
>>
>> 2. The RFC does not accurately portray Plaintiff's well-established impairments or consider the effect of those impairments on Plaintiff's ability to function.
>>
>>> a. The Plaintiff suffered from symptoms and exacerbations of her condition that were not considered by the ALJ.
>>>
>>> b. The ALJ failed to conduct a function-by-function analysis regarding how the impairments he identified would affect Plaintiff's ability to work, as required by 20 C.F.R. § 416.945 and SSR 98-6p.
>
> C. Based on the VE testimony, Plaintiff is entitled to benefits.

D. Alternatively, the ALJ failed to inquire whether the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT), as required by SSR 00-4p, which entitles Plaintiff to a remand.

E. The ALJ's Decision is not supported by substantial evidence because he failed to follow 20 C.F.R. § 416.929 and applicable case law in assessing Plaintiff's credibility.

F. Plaintiff is entitled to reversal of this case and an award of benefits, or alternatively, an award [of] benefits under the fourth sentence of 42 U.S.C. § 405(g).

(Statement of Errors, Plf. Brief at iii, docket # 11). Upon review, the Commissioner's decision will be affirmed.

## **Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there

exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374(6th Cir. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## **Discussion**

The ALJ found that plaintiff had not engaged in substantial gainful activity on or after April 24, 2007. (A.R. 21). He found that plaintiff had the following severe impairment: "asthma." (A.R. 21). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 21). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work. (A.R. 21-22). The ALJ determined that plaintiff's subjective complaints were not fully credible. (A.R. 21-24). Plaintiff has no past relevant work. (A.R. 24). Plaintiff was 19-years-old on the date she filed her application for benefits. Thus, at all times relevant to her claim for SSI benefits, plaintiff was classified as a

younger individual. (A.R. 24). Plaintiff has at least a high-school education and is able to communicate in English. (A.R. 24). The transferability of job skills was not material to a disability determination because plaintiff had no past relevant work. (A.R. 24). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 59,000 jobs in the State of Michigan that the hypothetical person would be capable of performing. (A.R. 57-58). The ALJ found that this constituted a significant number of jobs. Using Rule 202.20 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled. (A.R. 24-25).

1.

Plaintiff argues that the ALJ violated the "treating physician rule" in the weight assigned to a statement by Thomas Abraham, M.D., given to plaintiff's attorney on September 15, 2009. (Plf. Brief at 10-14; Reply Brief at 2-3). The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. §§ 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance" is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are

administrative issues reserved to the Commissioner. 20 C.F.R. §§ 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of

factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. § 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 652 F.3d 653, 659-61 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff presented very little evidence in support of her claim for SSI benefits. The vast majority of the records she did produce fell outside the period at issue: April 24, 2007, through October 27, 2009. The ALJ considered all the medical records, including the evidence dated prior to plaintiff's application for SSI benefits. (A.R. 23). Plaintiff's only hospital records for the period at issue were for treatment of an ovarian cyst on July 2, 2008. (A.R. 296-97). On December 6, 2007, plaintiff reported to a nurse at ProMed Physicians in Kalamazoo that she had been to an emergency room two or three months earlier for an asthma flare and had received treatment with steroids. (A.R. 229). The administrative record does not contain hospital records for this period.

X-rays taken of plaintiff's chest on December 21, 2007, returned normal results with the exception of "a slight increase in the AP diameter of the chest." (A.R. 256).

Plaintiff received her primary medical care from doctors at the Michigan State University/Kalamazoo Center for Medical Studies Clinic in Kalamazoo, Michigan. On February 1, 2008, plaintiff appeared at the clinic complaining of back pain and a longstanding history of asthma. She reported that she had slipped on the ice a month earlier. Doctors described plaintiff as a 19-year-old woman in no apparent distress. She was diagnosed with a ligamentous strain/muscle spasm in her lower back. She was advised to continue the asthma treatment regimen she had started in January 2008. (A.R. 278-80). On February 18, 2008, she reported to Zulfiqar Ali Turk, M.D., that her asthma was not controlled on her current medications. She stated that she experienced coughs and shortness of breath 4 or 5 times a week and the same symptoms at night 3 to 4 times a week. Plaintiff did not display any wheezing. Dr. Turk adjusted plaintiff's medications.

On March 13, 2008, plaintiff appeared at the clinic. It was noted that the poor numbers plaintiff reported on her home flow sheets were very difficult to reconcile with the test results recorded by medical professionals, which showed that plaintiff's PTFs were "fairly normal with minimal reversibility." (A.R. 275). Plaintiff's medication was switched from Pulmicort to Advair Diskus. (A.R. 274). On May 8, 2008, Dr. Turk noted that plaintiff was not using the Advair Diskus that he had prescribed. "Instead, she continued on Pulmicort which she ran out of a month ago and did not refill it. Since she stopped Pulmicort, her peak flow volume has been decreased." (A.R. 272). The objective results from Dr. Turk's examination were as follows:

> She is breathing heavily, but not using her accessory muscles. I do not hear any wheeze. Her pulse oximetry was 99% on room air with respiratory rate of 22. Lungs: Bilateral good air entry. No wheeze, no rales. Heart: S1, S2 was heard. No murmurs.

(A.R. 272). Dr. Turk prescribed Azmacort for plaintiff's asthma and Baclofen in response to plaintiff's complaints of back pain. (A.R. 272).

On June 12, 2008, Dr. Turk once again noted that plaintiff's statements regarding the severity of her asthma could not be reconciled with the objective test results:

> I have been seeing her in the past 1 year and she keeps a record of spirometry at home and according to her records, her number has dropped from 200 down to the 70s and 80s. I believe her clinical history does not correlate with my examination every time I see her she does not have any wheeze, good air entry. Her oxygen saturation on room air is 99percent.

(A.R. 289). Dr. Turk stated that plaintiff's pulmonary function tests in the past had returned normal results. (*Id.*). Plaintiff gave a "poor effort" on her pulmonary function test and was referred to a pulmonologist.[2] (*Id.*).

Dr. Abraham did not have any consulting, examining, or treating relationship with plaintiff until August 14, 2008, more than a year after plaintiff filed her application for SSI benefits. Plaintiff saw Dr. Abraham on a total of four occasions: August 14, September 16, and November 7, 2008, and January 15, 2009. (A.R. 310-21). On August 14, 2008, plaintiff stated that she had asthma and was unable to work because she had severe dyspnea and wheezing. (A.R. 318). Upon examination, Dr. Abraham found no evidence of wheezing. Plaintiff did have a cough and complained of chest tightness and shortness of breath. (A.R. 319). He recommended that plaintiff stop taking Azmacort and start taking Symbicort. Plaintiff could continue to use Albuterol as needed. (A.R. 319).

On September 16, 2008, plaintiff stated that she was unable to tolerate Symbicort because of nausea and stated that she had similar problems with Advair. She continued to take Azmacort. Dr. Abraham found no evidence of wheezing. He expressed skepticism regarding the

---

[2] In July 2008, plaintiff received the hospital treatment for an ovarian cyst previously noted. (A.R. 296-307). Clinic records dated August 8, 2008, noted that plaintiff appeared to be "overpowered by her parents" and they were "demanding narcotic medication for their daughter." (A.R. 287). Plaintiff received a prescription for Ultram rather than narcotics. (*Id.*).

accuracy of spirometry tests because he was not sure that plaintiff's vital capacity had been correctly measured. (A.R. 314). Plaintiff's resting room air saturation was 99%. He recommended that plaintiff continue with Azmacourt and that she use her Albuterol no more often than every four hours. (A.R. 314).

On November 7, 2008, plaintiff's pulmonary function tests displayed a dramatic post-bronchodilator effect with an FEV1 going from 1.25 to 2.97 after inhaled bronchodilator. This was accompanied by a significant reduction in residual volume and essentially normal diffusing capacity. Dr. Abraham began a trial of Prednisone to reduce airway inflammation and to decrease plaintiff's use of her rescue inhaler. (A.R. 311).

On January 15, 2009, plaintiff's lungs were clear. Dr. Abraham stated: "I would like to add a long-acting beta agonist, but she claims to be intolerant of these with complaints of nausea and vomiting." (A.R. 310). Dr. Abraham referred plaintiff back to Susan Bannon, M.D., her primary care physician. He stated that he "would be happy to see [plaintiff] again should problems develop." (A.R. 310). Dr. Abraham did not see plaintiff at any time after January 15, 2009.

On September 15, 2009, eight months after Dr. Abraham's last contact with plaintiff, plaintiff's attorney elicited a statement from Dr. Abraham. (A.R. 326-30). Although Dr. Abraham did not sign the statement (A.R. 330), for present purposes the court assumes that the transcript produced was accurate. Dr. Abraham's diagnosis of plaintiff's condition was "asthma." (A.R. 326). He summarized the "multiple precipitating factors" that plaintiff had described. (A.R. 327). He stated, "I think she does have asthma. Whether every episode that prompts her to use Albuterol is a real asthma attack or not I can't say. . . . Again, I'm not completely convinced that all the episodes that prompt her to use Albuterol are really asthma attacks, although I cannot tell you that they're

not." (A.R. 327-28). Dr. Abraham stated that although he had restricted plaintiff to using Albuterol no more than six times per day, she continued to exceed that limitation against medical advice. (A.R. 328). Plaintiff's attorney then stated that he believed that his client would indicate that she experienced instances "about 4 times a week, in which her heart races" for up to 30 minutes and asked Dr. Abraham for possible explanations for the symptoms. Dr. Abraham identified Albuterol abuse as a possible explanation. "I would guess that if she uses her Albuterol very frequently she gets that side effect of tachycardia." (A.R. 329). He indicated that tachycardia "could be" temporarily incapacitating. (A.R. 329). Plaintiff's attorney was able to elicit an opinion from Dr. Abraham that plaintiff was probably unable to work:

> Q: In her situation, because she's a young person, what she needs to prove that she can't do any work, including a simple unskilled job in a clean office environment, but it would be full time work, eight hours a day, five days a week. She'd have to maintain concentration, essentially for two hour segments, because a typical unskilled job gives a 10-15 minute break every 2 hours or so. But, in between then, other than a short bathroom break you've got to be on task. Do you think that she, and the standard would be more likely than not, do you think that at any time since you've been seeing her, that she would be capable of doing that kind of work?
>
> A: I think, more likely than not, she would be unable to perform any such work because of the situation she's in right now, just because she's getting short of breath, needing to use her inhaler or nebulizer and then if she gets tachycardic after it, that would mean frequent breaks throughout the day and that would be disruptive in the workplace.

(A.R. 229-30).

The ALJ carefully considered Dr. Abraham's statement and found that it was entitled to little weight:

> As for the opinion evidence, Dr. Abraham, the pulmonologist, was asked in September 2009 for his opinion based on four examinations and/or treatment from August 2008 to January 2009. On questioning from the claimant's attorney he agreed that if she had all the symptoms she alleges and suffers the side effects expected by overuse of Albuterol she would not be able to work. Dr. Abraham agreed that the claimant does not seem to be

malingerer, because he feels she really believes her symptoms are real, but she likely has some psychological overlay, and further treatment would be contingent on her financial ability. (Ex. 10). I cannot give this opinion much weight as it is ambiguous and to the extent he agrees with her alleged symptoms would be work preclusive, the clinical and objective evidence clearly contradicts her allegations.

(A.R. 24). Dr. Abraham's opinion that plaintiff was probably unable to work was entitled to no weight because the issue of disability is reserved to the Commissioner. 20 C.F.R. §§ 416.927(d)(1), (3).

Plaintiff makes a related argument that the ALJ failed to weigh the factors listed in 20 C.F.R. § 416.927(d)(2). The argument is meritless. The ALJ recognized that Dr. Abraham was a pulmonologist. (A.R. 24). The ALJ considered the treatment relationship, frequency of examination, nature and extent of treatment relationship, and the supportability and consistency of Dr. Abraham's opinions and summarized the same in his opinion. (A.R. 24). Further, contrary to plaintiff's assertion, Dr. Abraham never found that plaintiff experienced tachycardia. A review of Dr. Abraham's progress notes reveals no heart-related complaints or abnormalities. (A.R. 310-25). On August 14, 2008, Dr. Abraham recorded that plaintiff's "blood pressure [was] 120/80, pulse 80 and regular. . . . Cardiac exam reveals no murmurs or gallops." (A.R. 319). When asked by plaintiff's attorney for a possible explanation for the symptoms the attorney expected his client to describe at her upcoming administrative hearing, Dr. Abraham responded that "very frequent" Albuterol use could cause the side effect of tachycardia.[3] (A.R. 329). The court finds no violation of the treating physician rule and that the ALJ complied with the procedural requirement of providing good reasons for the weight he gave to Dr. Abraham's opinions.

---

[3]The social security regulations make clear that a claimant who fails to follow prescribed treatment without good reason will not be found disabled. 20 C.F.R. § 416.930(b).

**2.**

Plaintiff argues that the ALJ's factual finding regarding her credibility is not supported by substantial evidence because the ALJ "failed to follow 20 C.F.R. § 416.929 and applicable case law in assessing Plaintiff's credibility." (Plf. Brief at 18). This case turns on the credibility of plaintiff's testimony. Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). It is the ALJ's function to determine credibility issues. *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The ALJ considered the factors listed in 20 C.F.R. § 416.929, SSR 96-7p, and other applicable regulations and administrative rulings. He found that plaintiff's testimony regarding her subjective limitations was not fully credible:

> In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.
>
> In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.
>
> When she filed her application the claimant said she was disabled by severe chronic asthma. She said she was prevented from working by asthma that flares up just walking to the bathroom, and is worsened by shifts in the weather. She said she needed to use a nebulizer three to five times per day. (Ex 2E) She added later her attacks were brought on by standing, biking, walking, sitting, laughing, running, swimming, rollerblading or any exercise. She said the attacks last 15 minutes or longer. She said she was constantly out of breath and wheezing, and that she cannot go to college because she cannot walk across campus, and she cannot work due to the many triggers that set off an attack. (Ex 5E) She also wrote on a function report that she spends most of every day sitting and either watching television, playing video games or on the computer. She said she has no problems taking care of her own personal needs, and that she does not cook or do any household chores or yard work. She said she shops for 30 minutes once a month for personal items. She wrote that she could walk less than one-half block, and then would need to rest for 20 minutes. She added that stress or changes in routine make her asthma symptoms flare up.
>
> At the hearing the claimant testified that she coughs throughout the day, every day, with 10 to 20 episodes per day, varying based on the weather. She said she is always short of breath, and wheezing most of the time. She said she uses Albuterol in a nebulizer between six and

ten times daily, for 20 to 30 minutes per treatment, and uses Asthmacort twice a day. She said she stopped using Advair because it made her nauseous. She said her symptoms are worsened by perfumes, walking up to 200 yards, and sometimes just sitting and doing nothing. She said she sometimes seeks relief from "focused breathing." She reported that the last time she sought emergency room treatment for asthma symptoms was in 2006. She reiterated that she spends 90% of each day in her room avoiding "triggers." She said about four times per week she experiences racing in her heart for five to ten minutes due to overuse of Albuterol, and has a few minutes of chest pain afterwards.

She denied any other severe impairment.

She testified she can walk about 200 yards; can lift a gallon of milk with difficulty; and cannot climb stairs. She added that she stays home most days, and has 10 to 20 episodes of shortness of breath daily. She has been trying to follow her doctor's recommendation to limit her use of Albuterol to no more than six per day, but has to use more if the weather is bad, and some days only uses the medication three or four times per day. In addition, she does focused breathing an additional 10 to 20 times per day.

After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged inability to work due to the severity of her asthma and frequency of attacks, the medical evidence of record indicates a history of asthma since childhood. In February 2005 she told her doctor she was doing well, that being home-schooled was helpful, she had not had [] an asthma flare-up in over one month, was taking her treatments daily, and was getting out with her friends often (Ex 5F/page 11). She presented to her pediatrician on April 25, 2006 with some recent-onset wheezing. It was noted she had moved into an apartment with mold, and she had a cold. The doctor reported that her chest was clear and she had some nasal congestion. (Ex 2F) She was at the emergency room on August 12, 2006 with complaints of an asthma flare-up, but again she had a cold, displayed no asthma symptoms, but was positive for congestion. (Ex 1F/8)

After she transferred her care from a pediatrician to an adult primary care provider she underwent pulmonary function testing on March 13, 2008. The results were fairly normal and showed good reversibility with treatment. The doctor noted that the diagnosis of asthma was not clearly supported by a review of her medical records. (Ex 6F/5) As of May 8, 2008 the doctor noted that the claimant had not followed his orders to use different medication, choosing to continue another, running out of the other, and then having worsened symptoms as a result of not using any medication. (Ex 6F/2) Her doctor noted at a follow-up on June 12, 2008 that she does not present with the symptoms she subjectively describes, displaying good air entry and no wheezing at every visit. A repeat pulmonary function test that day

showed poor effort, leading the doctor to suspect underlying psychiatric issues. The claimant was resistant to the idea of such treatment for financial reasons. On August 8, 2008 the doctor's staff expressed concern about the claimant's home situation, noting an adult yelling at her in the background during phone conversations. In addition, the doctor noted that the claimant had recently presented with pelvic pain, refused a thorough examination, and her parent(s) were demanding narcotic pain medications. The doctor noted the claimant's flat affect, appearance of under-nourishment, and seeming to be overpowered by her parents. (Ex 7F)

Again on August 14, 2008 she presented with a cough but no wheezing (Ex 9F/12). She complained of repeated episodes of wheezing on September 16, 2008 and again the doctor noted that he was not able to appreciate any wheezing on examination. (Ex 9F/7) Additional pulmonary function testing on November 7, 2008 was performed by a pulmonologist who came up with findings similar to the past, of a fairly normal test with good results from treatment. His review and exams lead to a conclusion that she does not present with wheezing as alleged, would likely benefit from alternate treatment, but she is resistant to changing her medications, alleging she is allergic to everything else. (Ex 9F)

(A.R. 22-24). The ALJ correctly applied the law. His factual finding that plaintiff's testimony regarding her subjective functional limitations was not fully credible is supported by more than substantial evidence. Plaintiff's subjective description of her symptoms lacked substantial support in her own doctor's reports.

**3.**

Plaintiff argues that the ALJ's finding that she retained the RFC for a limited range of light work is not supported by substantial evidence. (Plf. Brief at 14; Reply Brief at 4-5). RFC is the most, not the least, a claimant can do despite her impairments. 20 C.F.R. § 416.945; *Griffeth v. Commissioner*, 217 F. App'x 425, 429 (6th Cir. 2007). RFC is an administrative finding of fact made by the ALJ on the record as a whole. 20 C.F.R. § 416.945(a)(1). The ALJ found that plaintiff retained the RFC for a restricted range of light work. She could "lift up to 20 pounds occasionally and 10 pounds frequently; sit, stand or walk up to six hours per eight-hour workday with normal breaks; no climbing of ramps, stairs, ropes, ladders or scaffolds; and the need to avoid concentrated

exposure to pulmonary irritants such as fumes, odors, dusts and gasses." (A.R. 21-22). The ALJ's RFC finding included all the limitations he found to be credible. His factual finding that plaintiff retained the RFC for a limited range of light work is supported by more than substantial evidence.

Plaintiff argues that the ALJ should have ordered a consultative medical examination or provided a medical expert at the hearing. (Plf. Brief at 15). It was plaintiff's burden to present evidence establishing her disability. *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). The Social Security regulations grant the ALJ the authority to order a consultative examination if a claimant's medical sources cannot give sufficient information about a claimant's impairments to enable the ALJ to determine whether the claimant is disabled. 20 C.F.R. § 416.917. However, "the regulations do not require an ALJ to refer a claimant to a consultative specialist." *Landsaw v. Secretary of Health & Human Services*, 803 F.2d 211, 214 (6th Cir. 1986). Rather, "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *see Ferguson v. Commissioner*, 628 F.3d 269, 275 (6th Cir. 2010). The ALJ did not abuse his discretion in declining to order a consultative examination.

**4.**

Plaintiff argues that the hypothetical question posed to the VE was inadequate, because it did not preclude exposure to all pulmonary irritants. (Plf. Brief at 16). Plaintiff's challenge to the adequacy of the hypothetical question posed to the VE is a mere reformulation of her unsuccessful challenge to the ALJ's credibility determination. The ALJ found that plaintiff's subjective complaints were not fully credible. It is well settled that a hypothetical question to a VE need not include unsubstantiated limitations. See *Carrelli v. Commissioner*, 390 F. App'x 429, 438

(6th Cir. 2010); *Gant v. Commissioner*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible."). The ALJ's hypothetical question included all the limitations he found to be credible.

Plaintiff's argument that the VE's testimony establishes her entitlement to benefits is equally meritless. The VE does not determine a claimant's medical restrictions or how they impact on the claimant's residual functional capacity – that is the ALJ's job. *See Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004); *Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 247 (6th Cir. 1987). The ALJ uses vocational expert testimony in the process of determining whether a significant number of jobs exist that a claimant can perform despite her impairments.[4] 837 F.2d at 247. Here, plaintiff's attorney asked hypothetical questions asking the VE to assume that plaintiff's testimony regarding her limitations was credible. (A.R. 59-60). Merely posing the hypothetical question does not compel the ALJ to find that the claimant actually suffered disabling fatigue, pain, or other subjective symptoms. The hypothetical question and response simply create a record from which the ALJ could base a decision finding that a significant number of jobs do or do not exist, in the event that the ALJ concludes that the claimant indeed suffers the degree of limitation she claims. Here, the ALJ found that plaintiff's subjective complaints were not fully credible. The ALJ was not bound in any way by a VE's responses to hypothetical questions incorporating a contrary assumption.

---

[4]"The function of the VE is to advise the ALJ of jobs found among various categories of employment which the claimant can perform with her limitations. The ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor h[is] finding to an 'individual's particular residual functional capacity.'" *Beinlich v. Commissioner*, 345 F. App'x 163, 168 (6th Cir. 2009) (quoting *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir.2003)).

Plaintiff argues that the ALJ committed error when he failed to inquire whether the jobs identified by the VE were consistent with the Dictionary of Occupational Titles (DOT). (Plf. Brief at 17-18). Under SSR 00-4p, the ALJ was required to ask the VE on the record whether the evidence he had supplied was consistent with the DOT,[5] and the ALJ's failure to do so was error. *Lindsley v. Commissioner*, 560 F.3d 601, 605 (6th Cir.2009); *see Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Information in Disability Decisions*, SSR 00–4p (reprinted at 2000 WL 1898704, at * 4 (SSA Dec. 4, 2000)). The Sixth Circuit has held that harmless error analysis applies in this context. *Lancaster v. Commissioner*, 228 F. App'x 563, 574 (6th Cir.2007).

Although the ALJ committed error when he failed to ask the VE whether his testimony regarding the jobs of assemblers (16,000), cashiers (40,000), and security guards (3000) (A.R. 57-58) was consistent with the Dictionary of Occupational Titles (DOT), the ALJ's error was harmless. Plaintiff, as the party attacking the agency's determination, has the burden of showing that the error was harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009); *see also Cantrell v. Astrue*, No. 4:11-cv-48, 2012 WL 6725877, at * 9 (E.D. Tenn. Nov. 5, 2012). Plaintiff was represented by counsel, and her attorney failed to ask the VE anything about consistency with the

---

[5] The DOT is a reference source available to vocational experts, but it is certainly not the only one. *See Baranich v. Barnhart*, 128 F. App'x 481, 486 n.3 (6th Cir. 2005); *see also* 20 C.F.R. §§ 416.960(b)(2), .966(d), .967. The DOT is somewhat limited in that it classifies jobs by skill and exertional (strength) demands. It does not address nonexertional limitations. *See Baranich*, 128 F. App'x at 485; *see also* 20 C.F.R. §§ 416.969, .969a. "[N]either the ALJ nor the VE is required to follow the DOT." *Beinlich v. Commissioner*, 345 F. App'x at 168 (citing *Wright v. Massanari*, 321 F.3d at 616). In *Wright v. Massanari*, the Sixth Circuit held that "the ALJ and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications." 321 F.3d at 616.

DOT. (A.R. 56-61). The hearing transcript shows that plaintiff's attorney had a more than adequate opportunity to question the VE if he had any concern whether the ALJ's testimony regarding the aforementioned jobs was consistent with the DOT. Plaintiff's brief and reply brief have not identified conflict between the DOT and the testimony of the VE. *Lindsley v. Commissioner*, 560 F.3d at 605. There is no evidence that the VE's testimony conflicted with the DOT. Plaintiff's argument that cashier, assembler, and security guard positions "could" involve exposure to cold, fumes, etc., does not suffice to carry her burden of demonstrating that the ALJ's omission caused her harm. Although a technical violation of SSR 00-4p occurred,[6] the error was harmless. *See Cantrell v. Astrue*, 2012 WL 6725877, at * 9 (collecting cases); *Fleeks v. Commissioner*, No. 08-cv-13135, 2009 WL 2143768, at * 6-7 (E.D. Mich. July 13, 2009) (same).

## Conclusion

For the reasons set forth herein, the Commissioner's decision will be affirmed.

Dated: June 17, 2013          /s/ Joseph G. Scoville
                              United States Magistrate Judge

---

[6]In *Shinseki v. Sanders*, the Supreme Court observed that the harmless error standard is intended to "prevent appellate courts from becoming impregnable citadels of technicality." 556 U.S. at 407.